The next case is McGowan v. Stanley. Good morning, your honors. My name is Ambrose Richardson. I represent the plaintiff's appellants in this case. The plaintiffs, two of whom are securities and investment professionals of long standing, believe that based on the evidence they've seen in which they presented, the defendants and their co-conspirators engaged in a series of undisclosed self-dealing transactions, obtaining money and property in false pretenses, and fraudulently, without paying much of anything at all, appropriated for themselves ownership of the stock and debt of a publicly held mining company incorporated in Arizona and operating in Utah. The fraud occurred in several stages, and we think by a preponderance of the evidence available that is clear, but if not, there are at least issues of fact. The defendants have portrayed themselves saviors of this enterprise, which in fact was a long standing gold mine, which was in need of capital in order to realize its potential value. This was provided by a joint venture tech partner, IG Tintic, which supplied money and expertise to this effort, and literally it became a very prosperous gold mine, but not through any efforts of the defendants. The initial pieces of evidence in which we rely are the purchase agreements themselves, the stock sale agreement and the debt assignment agreement. They called for $2.5 million to be paid for 83.5% of the stock of a chief consolidated mining company known as Chief, and $2 million for about $4.5 million. Counsel, you give many facts about the background and so on, but I'm having trouble finding admissible facts in the record that show the wrongdoing, that go to the wrongdoing. That's what I'm having trouble seeing in this record, and that's what the district court found too. I'd like to know what you point to in the record which is admissible that shows wrongdoing rather than the whole thing in which your client did lose something. That's fine, but you have to show wrongdoing. Yes, that's exactly what I was getting to, Your Honor. Thank you. The stock sale agreement, first of all, allowed a discount on the purchase price if the defendants or if Ruby Hollow, the acquiring company, paid the third-party payables of Chief to the tune of $1.5 million. The defendants admit this was not done. I mean, in page 601 of the appendix, Mr. Stanley, one of the defendants, admits that $1 million of these third-party payables were paid by Chief. They make the argument, well, why shouldn't Chief pay its own payables? Well, it should, but the defendants don't get a discount on the purchase price. That's a million of a million and a half that they admit. They admit in their answer to the complaint that Chief paid its own payables. And they argue, oh, it's just the same. It isn't the same. This is accounting 101. You know, you debit payables, you credit cash. It has no effect on the value of this company. So they say they resolve these claims. That's not the same thing as paying them. They claim they got credit for paying them. They didn't pay them. And they said we paid $400,000. This came from the accounts of Chief, the $400,000. So as to the million. Is the evidence supporting these allegations? Is it contained in your 56-1B response? I believe it is, Your Honor. And where would be the citations to the evidence that supports that? Okay, well, I did give a reference to the joint appendix, page 601, in which Mr. Stanley concedes that Chief paid over a million dollars of its own payable, but he claims that Ruby Hollow paid the other $400,000. On the other hand, he has also conceded in his certification that the only money that Ruby Hollow had came from Chief, which came from TINIC. He said we didn't have to raise money because we were going to get it from Chief. Counsel, if I can pick up on, speaking of Chief's question, if I can pick up on that, I think the Chief was referring to your 56.1 statement. And I want to remind you that a district court presented with a summary judgment motion has a set of rules. And the parties, frankly, neither party did a great job with the rules. But I'm looking at your plaintiff's response to defendant's statement of facts, which is at the joint appendix at 615 to 619. And the words admit and deny I don't even think appear once. And the local rule requires, first, an express admission or denial. And if there isn't one, then the fact is deemed admitted. And second, a supporting reference to the record. So as Chief Judge Livingston was asking, where in your statement do you comply with the rule and direct the district court to the evidence that you claim refutes the defendant's statements that you don't even deny? For example, there's a statement, plaintiffs do not know how to calculate their alleged individual damages. There is no denial. The response is plaintiffs have made a rough estimate of damages. A more precise figure is not possible without more accurate financial information than the defendants have provided. That answer gets us into the whole fact that there's a lot of talk about discovery in this appeal, even though you all didn't move to compel in the district court. Yeah, I mean, we were moving for extension on discovery, but it didn't happen. Well, but those issues are closed. And here you haven't denied the statement. And so why should we not deem it admitted? Paragraph 9, Joint Appendix 618. Why should that not be deemed admitted? Well, I don't think that at this stage of the pleadings they don't know how to calculate their individual damages. Well, we're not in the pleadings. We're post-discovery. What, they're post-what? We're post-discovery. We're not in the pleadings, right? Okay, yes. So this is the 56-1. The answer is you would need more information to calculate the damages. But the damages, the theory is pretty simple. But, counsel, I understand. I'm asking you for rule compliance purposes. I have seen a thousand summary judgment motions. And there is a rule for a reason. And the local rule specifically requires an admission or denial. If a denial, it must be supported by a citation to record evidence. And if that does not happen, the court is entitled to deem the statement admitted. So my question to you is, why should we not deem and why should the district court not have deemed paragraph 9, for example, admitted? Because they did, you know, as I said, the rough estimate consisted of nine times the amount that they received on the freeze-out merger. But this still leaves lacking a denial and evidence supporting that denial sufficient that the district court should take it. This goes back to my first question. You know, many nice statements. But where is there a real focus on what the defendants, what opposing party did was wrong, meeting the rules for what a denial must be. The opposition was stated quite definitely in the papers opposing the defendant's motion for summary judgment. We had specific numbers that we put in there. I mean, if it wasn't in the Rule 56 answer, it certainly was in the, both in the certifications and in the brief, what the calculations were as to what the damages were. Their damages, their personal damages, exceeded $2 million, Your Honor. Thank you. We'll hear from your adversary. What? We'll hear from your adversary. All right, thank you. Unless you wanted to use your rebuttal time now. I'll use my rebuttal time. Good morning, Your Honors. Craig Perry from Parr, Brown, Gee, and Loveless on behalf of defendants and appellees. I think the best way to describe this case is if, is that plaintiffs presented their opening arguments. They presented a story of what the evidence would show. A story that showed wrongdoing and that would lead a court or a jury to find in their favor. But then at the end of those opening arguments, plaintiffs rested their case. They rested their case without presenting any evidence. And indeed, the briefs on this appeal are essentially citations to those opening arguments. And as pointed out in our briefing, many of the statements in what I will call the opening arguments or in their Rule 56F statement, excuse me, the local Rule 56.1, a lot of those statements are contradicted by the evidence a lot. Many contain no reference whatsoever to the evidence. And some of them are not supported even by the document to which they cite. I mean, essentially what the district court had on summary judgment, both our motion and plaintiff's motion, was a 16-page declaration of Jeff Stanley, who was a principal of Ruby Hollow, and who testified to this information in the declaration on his personal knowledge. And the declaration wasn't challenged. And against that is an eight-page declaration of plaintiff's counsel, where plaintiff's counsel essentially makes the statements that one would make in an opening argument. And that led the court to succinctly sum up the case. And this is at page 12 of the special appendix. And this is from the court's order that's being appealed, quote, defendants adequately shifted their burden as movement for summary judgment by pointing to a lack of admissible evidence to prove every element of plaintiff's claims. I want to ask you about that, counsel. What is that burden? I've spent more time in Celotex in the last couple of weeks than I have in about 25 years trying to figure out what does it mean to point to. I was sort of hopeful in your papers that we would see a more specific pointing. And Celotex does talk about a burden on the moving party. And here it feels like you just sort of said, look, Judge, there's no there there, as opposed to going through and identifying gaps in a more specific way. What's your take on what the burden is on the moving party when we talk about, quote, pointing to a lack of evidence? Well, it's always difficult because you're trying to prove a negative. You're trying to prove that something is not there. Well, you just have to point to it, right? You don't have to prove it. Right. And really, essentially, that's what we did. I mean, this was a case where it wasn't just one or two critical elements of a claim didn't exist. There was no admissible evidence on summary judgment. Some elements did exist, right? So is there no fiduciary duty present? Is there any dispute about whether there is a duty? Oh, yeah. Yeah. There was a, you know, managers owe a fiduciary duty under Arizona law to the members. Right. So it's not that they utterly failed. No. That they missed an element. So that's what I'm asking is, doesn't the moving party have some obligation to give some specificity about what's lacking? Well, and that's what we tried to do in the absence of the facts and down in the argument on the claims. For example, on the breach of fiduciary duty, yes, there is a fiduciary duty owed under Arizona law. But there was no evidence of the breach of the fiduciary duty. There were statements of counsel saying that, well, these guys mismanaged the company. But there was no evidence. There was just an absolute absence of evidence on that point, both in their 56-1 statement, which was simply, as the court found, it was citations to an unverified complaint and citations to a declaration by counsel, not made on personal knowledge, but essentially his argument. And then in 56-1, I think it's C&D, when they're supposed to respond to our statement, again, it was the same thing. So there were no facts. I mean, and I think that's what the court found. It's not like there was one element of a specific claim missing. It was like almost none of the elements was proved. And I think once we point that out, then it's their responsibility to come back with admissible evidence or evidence that can be made admissible at trial, admissible evidence on which a jury could find in their favor. And that's what the court found. There just simply was not there. I mean, as counsel, you know, spoke about these payments, and that's a big, big thing that they have as well. The purchase price. In the answer to the complaint, I think you said that Chief, not Ruby Hollow, paid, made certain payments that were, paid certain debts that this SSA contemplated that Ruby Hollow would pay. No, and that's plaintiff's argument. The SSA states that, and this is the share sale agreement, so this is what Ruby Hollow purchased the Chief's shares from Lead FX for 2.5 million. One million was to be paid up front, and Mr. Stanley, in his declaration, said we paid the million dollars. The other 1.5 million, that was to be paid in 12 months, but it was subject to an offset for resolving Chief's debts. At the time of the purchase, Chief hadn't been a functioning company for 20 years. It was in a mess. There were all sorts of things, quote, unquote, on the books as to debts that were owed. There were some that were certain, like Department of Oil and Gas and Mineral bonds, water, Conservancy District bonds, reclamation bonds, property taxes. There were a lot of debts that were some certain, but then there were a lot of debts from past shareholders, past officers and directors that were not documented. And that was to the tune of about 1.9 million, and those were called unverified debts in this agreement. And so what the parties agreed was, well, to the extent that that was 1.9 million in unverified debts or legitimate, well, that reduces the value of Chief dollar for dollar basis. To the extent they're not legitimate and Chief never has to pay to satisfy those debts, well, then the value of Chief stays higher. So what Led FX, the seller, and Ruby Hollow, the purchaser, agreed was, okay, Ruby Hollow, you have a year to go and try, and the word in the SSA is resolve those debts. It doesn't say that Ruby Hollow has to pay them, and Chief was not a party to the SSA, nor were they a beneficiary. So Chief had no right, pursuant to the SSA, to say, well, you're supposed to pay our debts. What the agreement was, and this is explained in the declaration by Jeff Stanley, was Ruby Hollow goes and resolves those debts. Those debts are Chief's debts, so Chief has to pay for them. But if it turns out that some of the debts weren't legitimate and Chief didn't have to pay for them, well, then the value stays up. Well, as it turns out, there was 1.03 million in debts that Chief itself had to pay because they were Chief's debts, and so the purchase price was reduced by 1.3 million because the value went down because Chief's assets were used to pay these debts, and then the remaining 464,000 or so was paid by, or almost 500,000, was paid by Ruby Hollow. And importantly, so the only evidence before the court on that issue was Jeff Stanley, the manager of Ruby Hollow's testimony, that this is what the agreement meant, and the judge, in her order, said, yes, that's what it meant, and the judge herself said, yeah, there's no obligation here for Ruby Hollow to satisfy Chief's debts. And the only thing contrary to that is counsel's own statement that, well, I don't think that's what the agreement said. That's not fair. And let's keep in mind, Let FX, the other party to this contract, they didn't get any evidence from Let FX. There's no evidence here that Let FX says these agreements were breached. So you have the declaration from one party saying this is how the transaction worked, and this is how we followed it, and we followed it as we should. You have no statement from the other party to the transaction saying, well, something's wrong here. You simply have the arguments of counsel that says this doesn't look right to me. And counsel, as you know from reading the record, there was essentially no discovery on the other side. They took no depositions of our people. They waited five months until Judge Cote ordered them to respond on a protective order. We had 1,000 documents ready to be produced to them in December. They made no response on a proposed protective order until Judge Cote ordered them to do it, and when they did it, we immediately gave them the documents. That was nine days before discovery ended. They didn't file any expert reports, which that might be how one marshals the evidence to go through and say, well, no, look, these transactions were wrong based on the evidence. So, anyway, my time is up. I appreciate the opportunity. Thank you. We'll hear rebuttal. Okay, sure. The share sale agreement says that the purchaser will pay the vendor an amount equal to $1.5 million, less all amounts the purchaser has paid to third-party creditors in the next 12-month period. We have also submitted the statement from Andrew Worland, who is a party representative at FX, who came to the same interpretation of this agreement. Pay means pay, and these other rationalizations are nonsense. In addition, they didn't address the corporate opportunity claim. We did provide evidence that Chief's money was paid to satisfy the $2 million price for purchasing $4 million in debt, which Ruby Hollow claimed to own on paying $1 back in December 2008. That evidence is in the record. These questions weren't asked in our response to their 56.1, you know, statement. They were asking questions about the depositions of Mr. McGowan and Mr. Bruderman, who don't have personal knowledge about these things. They're investors. They have knowledge about their stock. They have Mr. Bruderman, who is an expert, has presented testimony here, describing these situations and how this is a corporate opportunity to buy, to satisfy $4.5 million in debt for $2 million. You know, the Ruby Hollow has used this $4 million as an excuse to extract money over and over again, money that this, a right that they didn't pay for. We mentioned it in our briefs. There was a $942,000 which were paid to the members of Ruby Hollow from Chief. They say, well, you know, the fact that you, I said there's no corporate authorization. They said it's not evidence for you to say there's no corporate authorization. There was no corporate authorization. We believe this was simply to pay back the Ruby Hollow members who loaned money for the initial purchase. In effect, they paid nothing for it. So I said I don't think the 56.1 is the place where we were going to respond to this and present the evidence because they were mostly focusing on the depositions of Mr. McGowan and Mr. Bruderman, who, as I said, are investors. They're not personally involved in these transactions. And, in fact, most of these transactions, you know, had to be dug out. They came from third parties. We got from them no current corporate records, no books of account, no closing documents, no e-mails or communications, and nothing from any of the defendants. You know, these were either excessive or irrelevant or something like this. I forget the new term that they're using for not responding to these things, but they didn't provide the documents that might have been within the realm of reason, and so they said. So, yeah, no, we have been struggling with the defendants. We wanted things not to be subject to confidentiality because this is a public company. And so much of this stuff was hidden. You know, the fact that they issued another 27 million shares to themselves after the gold mine was struck. Anyway, I've gone over my limit. So this is in our briefs, Your Honor. Thank you very much. Thank you both, and we'll take the matter under advisement. Thank you.